IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

Billy S., Jr.,[1]                )     C/A No.: 1:21-3031-SVH
                            )
           Plaintiff,     )
                            )
    vs.                   )
                            )     ORDER
Kilolo Kijakazi, Acting   )
Commissioner of Social Security  )
Administration,         )
                            )
          Defendant.   )
                            )

This appeal from a denial of social security benefits is before the court for a final order pursuant to 28 U.S.C. § 636(c), Local Civ. Rule 73.01(B) (D.S.C.), and the order of the Honorable J. Michelle Childs, United States District Judge, dated December 9, 2021, referring this matter for disposition. [ECF No. 10]. The parties consented to the undersigned United States Magistrate Judge's disposition of this case, with any appeal directly to the Fourth Circuit Court of Appeals. [ECF No. 9].

Plaintiff files this appeal pursuant to 42 U.S.C. § 405(g) of the Social Security Act ("the Act") to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying the claim for disability insurance benefits ("DIB"). The two issues before the court are

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to claimants only by their first names and last initials.

whether the Commissioner's findings of fact are supported by substantial evidence and whether she applied the proper legal standards. For the reasons that follow, the court reverses and remands the Commissioner's decision for further proceedings as set forth herein.

I.     Relevant Background

A.     Procedural History

On December 27, 2019, Plaintiff protectively filed an application for DIB in which he alleged his disability began on April 28, 2019. Tr. at 80, 165–71. His application was denied initially and upon reconsideration. Tr. at 95–98, 100–05. On May 4, 2021, Plaintiff had a hearing by telephone before Administrative Law Judge ("ALJ") Nicole Forbes-Schmitt. Tr. at 34–70 (Hr'g Tr.). The ALJ issued an unfavorable decision on May 19, 2021, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 18–33. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–7. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on September 20, 2021. [ECF No. 1].

B.     Plaintiff's Background and Medical History

1.     Background

Plaintiff was 41 years old at the time of the hearing. Tr. at 42. He completed two years of college. *Id.* His past relevant work ("PRW") was as a firefighter, a construction worker I, a salvage laborer, a painter, a frame spinner, and a tank farm attendant. Tr. at 60–62. He alleges he has been unable to work since April 28, 2019. Tr. at 165.

2.     Medical History

Plaintiff presented to Todd Cook, M.D. ("Dr. Cook"), on May 1, 2019, complaining of neck problems. Tr. at 406. He described deep pain to his posterior neck that was associated with weakness, numbness, tingling, and radiation down his arm. Tr. at 407. He indicated he had previously undergone anterior cervical discectomy and fusion ("ACDF") in 2014. *Id.* Dr. Cook observed decreased sensation of the radial forearm, thumb, and index finger in a C6 distribution, paracervical tenderness, abnormal extension of the cervical spine, diminished grip strength on the right, and medial forearm hypoesthesia on the right. Tr. at 408. He noted x-rays showed a solid ACDF at C5–6 with some spondylosis at C7–T1. *Id.* He ordered magnetic resonance imaging ("MRI") of the cervical spine and provided a work note restricting Plaintiff to lifting 20 pounds with office work preferred. *Id.*

On May 14, 2019, an MRI of Plaintiff's cervical spine showed uncovertebral joint bony spurring and paravertebral osteophyte formation with foraminal and cord narrowing at C3–4, C4–5, and C6–7. Tr. at 277–78. The findings were the worst at C3–4 on the right, where there was a prominent bony spur causing severe right foraminal narrowing. *Id.*

Plaintiff returned to review the MRI results on May 23, 2019. Tr. at 404. Dr. Cook noted decreased sensation of the radial forearm, thumb, and index finger in a C6 distribution, tenderness of the paracervical muscles, abnormal cervical extension, diminished grip strength on the right, and medial forearm hypoesthesia on the right. Tr. at 405. He indicated the MRI showed a stable-appearing C5–6 ACDF and a right C3–4 disc protrusion with foraminal stenosis. *Id.* He assessed neck pain and cervical radiculopathy and referred Plaintiff for C3–5 facet injections on the right. Tr. at 405–06.

Stephen Parker, M.D. ("Dr. Parker"), administered cervical facet injections on the right at C3–4, C4–5, and C5–6 on May 28, 2019. Tr. at 403.

Plaintiff presented to Dr. Cook on May 30, 2019, complaining of sudden onset of low back pain and left leg numbness that had presented during the cervical spinal injections Dr. Parker administered two days prior. Tr. at 400. He endorsed back pain, neck pain, weakness, and numbness. Tr. at 400–01. Dr. Cook noted 3/5 left hip flexion and global paresthesia and numbness in

the lower leg region. Tr. at 401. He assessed low back pain and ordered an updated MRI. *Id.*

On June 3, 2019, an MRI of Plaintiff's cervical spine showed stable multilevel degenerative changes at C3–4, C4–5, and C6–7 and stable ACDF at C5–6. Tr. at 272–73. It specifically indicated severe right foraminal stenosis and mild canal stenosis due to a broad-based right paracentral disc protrusion at C3–4. Tr. at 272.

Plaintiff followed up to discuss the MRI results on June 13, 2019. Tr. at 397. Dr. Cook observed decreased sensation of the radial forearm, thumb, and index finger in the C6 distribution, tenderness of the paracervical muscles, abnormal cervical extension, 4/5 hip flexion, difficulty performing single stance with toe raised, diminished grip strength on the right, and medial forearm hypoesthesia on the right. Tr. at 398–99. He indicated the MRI showed no obvious spinal cord changes, hematoma, or new stenosis to account for Plaintiff's left lower extremity issues. Tr. at 399. Plaintiff reported frequent falls due to weakness in his left leg, use of a cane, and inability to differentiate between hot and cold temperatures on the left leg. *Id.* Dr. Cook referred him to physical therapy and prescribed Gabapentin. *Id.*

Plaintiff initiated physical therapy on June 25, 2019. Tr. at 359. He reported falls due to an inability to feel his left lower extremity. *Id.* He described nerve pain from his neck to his right arm, numbness and tingling

in his right arm and into his finger, and increased pain in his leg with walking. *Id.* Physical therapist Marguerite Oliver ("PT Oliver") observed mild tenderness in the middle right-sided trapezius and the C6 and C7 spinous processes, antalgic gait of the left lower extremity, decreased range of motion ("ROM") of the cervical spine, decreased strength in the cervical spine and right hip and knee, and positive Adson test, bilateral quadrant test, Ulnar upper limb tension test, and Spurling test in position 1. Tr. at 360.

Plaintiff reported his pain as a six out of 10 and complained of tightness to the right side of his neck and weakness throughout his left lower extremity on July 3, 2019. Tr. at 353. Physical therapy assistant Marie Estess ("PTA Estess") observed Plaintiff to have a notable limp with walking in the clinic. *Id.*

Plaintiff followed up with Dr. Cook to discuss physical therapy on July 10, 2019. Tr. at 394. He reported it had provided some relief to his cervical region, but no improvement to his lower back. *Id.* He indicated he had experienced frequent falls due to left leg weakness and was using a cane. Tr. at 396. Dr. Cook observed decreased sensation of the radial forearm, thumb, and index finger in a C6 distribution, tenderness of the paracervical muscles, replication of neck and shoulder pain with cervical extension, 2/5 left hip flexion, and 3+ dorsiflexion. Tr. at 395. He assessed neck pain, cervical

radiculopathy, and lumbar radiculopathy and referred Plaintiff for an updated MRI. Tr. at 396.

A July 16, 2019 MRI of Plaintiff's lumbar spine showed no evidence of acute facture or significant subluxation. Tr. at 412.

On July 17, 2019, Plaintiff reported an incident two days prior in which he pulled his neck while reaching for something, felt something pop on the left side of his neck, and developed radiating pain from his skull down into his shoulder. Tr. at 347.

Plaintiff also followed up with Dr. Cook for lower back pain on July 17, 2019. Tr. at 391. Dr. Cook recorded tenderness of the iliolumbar region, pain with active and passive ROM of the lumbar spine, 2/5 hip flexion on the left, and 3+ dorsiflexion. Tr. at 392–93. He reviewed the most recent MRI, noting it showed no disc pathology or stenosis and a normal terminal cord. Tr. at 393. He prescribed Requip 0.25 mg for lumbar radiculopathy and encouraged Plaintiff to continue with physical therapy. *Id.*

On July 23, 2019, Plaintiff reported his left knee had buckled a couple of times and he had fallen down steps at his home, but had not sustained an injury. Tr. at 341.

Plaintiff rated pain in his bilateral neck and shoulders as an eight out of 10 on August 1, 2019. Tr. at 338. He indicated he had driven eight hours from Mississippi the prior day and that his left leg had felt completely numb

three hours into the trip. *Id.* He stated his ankle, shin, and the top of his foot felt heavy and his entire leg felt heavy upon walking. *Id.* He denied being able to feel hot and cold sensations on his leg. *Id.* He noted he had some sensitivity on the inside of his thigh, but no sensation on the outside of his leg. *Id.*

On August 6, 2019, Plaintiff reported falling on the prior day. Tr. at 334. PTA Estess noted Plaintiff's normal gait pattern was antalgic with hyperextension of the left knee. Tr. at 336.

Plaintiff reported no improvement in left leg numbness on August 14, 2019. Tr. at 389. Dr. Cook observed Plaintiff to be ambulating with no assistive device. Tr. at 390. He noted tenderness of the iliolumbar region, pain with active and passive ROM, 3/5 left hip flexion, and 4/5 dorsiflexion of the left tibialis anterior. *Id.* He prescribed Cyclobenzaprine, encouraged low-impact exercise, and instructed Plaintiff to follow up in four weeks. *Id.*

On August 19, 2019, Plaintiff reported he had been unable to walk and put weight on his left lower extremity following the prior session. Tr. at 325. He complained his neck was always stiff. *Id.* He reported falling over the prior weekend and bruising his left knee, although he stated he did not feel the pain when the fall occurred. Tr. at 327.

On August 21, 2019, Plaintiff rated his right neck pain as a seven. Tr. at 322. He indicated he had cleaned his garage and lifted five-gallon cans the

prior day. *Id.* He described a feeling like "bee stings from the [right] side of [his] neck to [his] shoulder." *Id.*

On August 27, 2019, Plaintiff reported no improvement and complained of increased buckling of the left lower extremity. Tr. at 293. He described tingling in the front of the thigh, knee, and anterior tibial region while working hard on physical therapy exercises. Tr. at 295.

On September 10, 2019, Plaintiff reported falling twice since his last session. Tr. at 316. He complained of a feeling of "bee stings" on the right side of his neck, under his left arm, and in his right flank that had started after he sustained the falls. *Id.*

On September 12, 2019, Plaintiff reported deep pain in his lumbar spine that radiated to his foot and was associated with weakness, numbness, tingling, and radiation down the left leg. Tr. at 386. He endorsed difficulty exercising, neck pain, muscle weakness, and restless legs and denied improvement. *Id.* He indicated a fall approximately two weeks prior had led to increased symptoms. Tr. at 387. Dr. Cook observed tenderness of the iliolumbar region, pain with active and passive ROM of the lumbar spine, 3/5 left hip flexion, and 3+ dorsiflexion. *Id.* He prescribed a hinged brace for strength due to weakness in Plaintiff's hamstrings. *Id.* He noted Plaintiff had reported no relief with Gabapentin or Requip. *Id.* He encouraged Plaintiff to remain active with low-impact exercise. *Id.*

9

On September 16, 2019, Plaintiff denied falling since he started wearing the knee brace. Tr. at 310.

On September 23, 2019, PTA Estess noted Plaintiff had met two of seven goals. Tr. at 308. Plaintiff reported being able to drive for one hour before experiencing pain and tightness and to sleep without neck pain, but with symptoms of restless leg syndrome. *Id. He* indicated his falls had decreased with use of a knee brace. *Id.*

On September 30, 2019, Plaintiff reported increased fatigue to his right lower extremity after spending time in his yard with his children over the weekend and overdoing it. Tr. at 300.

On October 3, 2019, Plaintiff reported his left lower extremity was easily fatigued with activity. Tr. at 297. He noted he had been more active at home and had noticed increased stinging at C3 on the right side that radiated into his trapezius. *Id.* He reported being able to complete activities of daily living ("ADLs") that included laundry, washing dishes, and cooking for 30 to 45 minutes before becoming fatigued. Tr. at 298. PTA Estess noted a positive Trendelenburg gait pattern and increased quad strength. *Id.*

PT Oliver discharged Plaintiff from physical therapy on October 17, 2019, after 25 treatment sessions. Tr. at 283. Treatment had focused on difficulty finding a comfortable sleeping position, difficulty walking, loss of function, loss of motion, pain, and weakness. *Id.* Plaintiff reported sustaining

a fall the prior Saturday when he was not wearing his knee brace. *Id.* He rated his pain as a five out of 10 at the time of discharge. *Id.* PT Oliver observed mild tenderness to the right middle trapezius and spinous processes at C6 and C7, antalgic gait with left lower extremity impairment, 4-/5 strength on left hip and knee extension, 3-/5 strength on left knee flexion, 2-/5 strength on ankle dorsiflexion, and 3/5 strength on left hip flexion, left hip abduction, and ankle plantar flexion. Tr. at 283–84. Plaintiff's strength increased in left hip extension from his initial presentation, but his strength in left hip flexion and abduction and knee flexion decreased. Tr. at 284. PT Oliver noted Plaintiff "continue[d] to lack ability to complete [straight-leg raising]," his left lower extremity "continue[d] to buckle," and he "continue[d] to have [loss of balance] and falls." Tr. at 285. She stated Plaintiff had not met goals and had plateaued in strength and function due to weakness. *Id.* She discharged Plaintiff with instructions to continue his home exercise plan. *Id.*

Plaintiff reported no improvement in left leg numbness on October 24, 2019. Tr. at 383. Dr. Cook recorded normal findings on exam, aside from tenderness of the bilateral iliolumbar region, pain with active and passive ROM, 3/5 left hip flexion iliopsoas, 4/5 dorsiflexion of the left tibialis anterior, and 3+ dorsiflexion. Tr. at 384. He assessed lumbar radiculopathy and

ordered a functional capacity evaluation ("FCE") for a rating on disability moving forward. *Id.*

Plaintiff participated in an FCE on November 7 and 8, 2019. Tr. at 367–75. Occupational therapist James Kuykendall ("OT Kuykendall") indicated Plaintiff's patterns of movement and physiological responses were consistent with maximal effort and full participation in testing. Tr. at 369. Plaintiff reported soreness and discomfort in his neck, shoulders, and back and a heavy feeling in his left leg on the second day of testing. *Id.* OT Kuykendall stated Plaintiff's performance on the second day of testing was less than his performance on the first day and was more reflective of what he was capable of repeating on a day-to-day basis. *Id.* He observed unusual movement patterns, including hip-hiking and knee stiffness during walking and bending activities. *Id.* He concluded Plaintiff was limited in his ability perform walking, stair-climbing, kneeling, and crouching. *Id.* He stated carrying should be limited to short distances and no more than 40 pounds. Tr. at 370. He noted Plaintiff was unable to safely get into and maintain a crouched position and should sit when appropriate for low work. *Id.* He stated Plaintiff was limited in his ability to climb stairs due to a weak left leg and unstable knee and was limited in carrying due to lack of left knee strength and safe flexion. Tr. at 371. Consequently, he recommended walking be limited to short distances of less than 100 yards. *Id.* He indicated Plaintiff

was limited in his ability to push and pull by left leg weakness and an unstable knee. *Id.* He recommend pushing and pulling be limited in duration and resistance. *Id.* He recorded reduced ROM as to the following: extension, right lateral flexion, and right rotation of the neck; flexion and extension of the right wrist; fixed and extended flexion of the left knee, abduction and adduction of the right knee; and plantar flexion, dorsiflexion, inversion, and eversion of the left ankle. *Id.* He noted 1/5 strength throughout the left hip and knee. Tr. at 373. He recorded 1/5 strength to left ankle flexion and dorsiflexion and 0/5 strength to left inversion and eversion. Tr. at 374. Plaintiff demonstrated abilities for sitting, bending over, climbing stairs, pushing/pulling, standing, and performing overhead work frequently. Tr. at 368.

On November 20, 2019, Dr. Cook observed Plaintiff to appear healthy and in no acute distress, to be ambulating with no assistive device, to demonstrate tenderness of the right and left iliolumbar regions, and to have pain with active and passive ROM of the spine. Tr. at 381. He noted 5/5 motor strength in most regions, except for 3/5 left hip flexion and 4/5 dorsiflexion of the left tibialis anterior. Tr. at 381. He recorded normal findings on neurological exam. *Id.* He indicated 3+ dorsiflexion. *Id.* He recounted the FCE showed Plaintiff to have continued difficulty with basic activities, such as climbing stairs, and to be unable to perform his work-

related duties due to pain. *Id.* He instructed Plaintiff to continue his home exercise and stated he "d[id] not have any further interventions that c[ould] alter the deficit of lower extremity." *Id.* He stated Plaintiff would "need to seek employment that is light duty with minimal need to climb stairs." *Id.* He indicated Plaintiff should follow up as needed. *Id.*

A letter from the director of human resources for Plaintiff's employer dated December 10, 2019, reflects the following: Plaintiff was out of work on short-term disability and under the Family and Medical Leave Act ("FMLA") from May 3 to July 26, 2019; his FMLA leave ended on July 26, 2019; his short-term disability was extended through November 3, 2019; and he was approved for long-term disability from November 3, 2019, through January 30, 2020. Tr. at 262. The letter further indicates Plaintiff's employer was unsuccessful in finding any open positions that were consistent with his abilities as reflected in the FCE. *Id.* The human resources director informed Plaintiff that he would be terminated as of December 10, 2019. Tr. at 263. An attachment to the letter explained to Plaintiff that his medical, dental, and vision benefits would be terminated on the last day of the month unless he elected to continue them under Consolidated Omnibus Budget Reconciliation Act ("COBRA") provisions. Tr. at 264.

On April 9, 2020, state agency medical consultant George Keller, M.D. ("Dr. Keller"), assessed Plaintiff's physical residual functional capacity

("RFC") as follows: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for a total of two hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; occasionally push and pull with the left lower extremity; never climb ladders, ropes, or scaffolds; occasionally balance, stoop, kneel, crouch, crawl, and climb ramps/stairs; occasionally reach overhead with the left upper extremity; no overhead reaching with the right upper extremity; and avoid even moderate exposure to vibration and hazards. Tr. at 74–77.

On October 17, 2020, state agency medical consultant Sannagai Brown, M.D. ("Dr. Brown"), assessed the following RFC: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for a total of two hours in an eight-hour workday; occasionally push and pull with the left lower extremity; never climb ladders, ropes, or scaffolds; occasionally balance, stoop, kneel, crouch, crawl, and climb ramps/stairs; occasionally reach overhead; and avoid concentrated exposure to wetness, vibration, and hazards. Tr. at 86–89.

C.    The Administrative Proceedings

1.    The Administrative Hearing

a.    Plaintiff's Testimony

Plaintiff denied having worked since April 28, 2019. Tr. at 47. He testified he was unable to work because he could not walk without the

assistance of a cane or splint and always had pain in his back and neck. *Id.* He said he had spasms in the back of his neck and pain that radiated between his shoulder blades. *Id.* He stated he had lost feeling in his left thumb and first and middle fingers. *Id.* He indicated he had difficulty getting comfortable due to leg and back problems. Tr. at 47–48. He stated it was hard for him to concentrate. Tr. at 48. He testified he would lie in his recliner to alleviate the pain because his leg felt heavy. *Id.* He said he had to drag his leg, experienced pain in his hip, and had shin splints in his right leg. *Id.* He noted he had to push his left leg as he walked. *Id.*

Plaintiff testified he used ibuprofen and Flexeril, as well as some Gabapentin, but tried not to take it because it made him feel dizzy. *Id.* He stated Dr. Cook had prescribed Flexeril, but he had not followed up with him since November 2019. *Id.*

The ALJ questioned whether Plaintiff agreed with the results of the FCE. Tr. at 49. Plaintiff stated he felt that his leg size had decreased, and he was weaker and more limited than he had been at the time of the FCE. *Id.* He said he had difficulty with balance and struggled to carry a bag of groceries. *Id.*

The ALJ noted the record showed Plaintiff had initially required a cane, but had subsequently graduated to a hinged knee brace and questioned whether that was no longer the case. *Id.* Plaintiff stated he still used the cane

because the brace no longer fit his leg. Tr. at 50. He indicated he wore the brace and used a cane outside of his house. *Id.* He said he fell almost daily and had recently broken his middle finger when he sustained a fall. *Id.* He denied obtaining medical treatment for his broken finger and said he had splinted it himself, as he was trained to do so as a firefighter. *Id.*

Plaintiff denied having a diagnosis specifically related to his knee, but said he felt the muscle on the front part of his leg had died because he could not flex it. *Id.* He indicated Dr. Cook had informed him during his last visit that there was nothing more he could do to improve his condition. *Id.* He denied having any mental or emotional problems that limited his ability to work. *Id.*

Plaintiff testified his problems started on June 4, 2019, when he received the second in a series of injections to his neck. Tr. at 52. He said that when the doctor inserted a needle into his neck, he experienced a sensation as if he were being electrocuted. *Id.* He stated the sensation radiated throughout the left side of his body, from his arms, through his fingers, and into his leg and foot. *Id.* He indicated he felt the sensation for about a minute. *Id.* He said that after the procedure, he noticed a weird sensation in his left leg and buttock. *Id.* He stated he visited the emergency room the following day, after he woke with heaviness and no feeling in his left leg. Tr. at 52–53. He admitted his left arm was initially affected, but it had improved, aside

from reduced strength and occasional tingling in his fingers and thumb. Tr. at 53.

Plaintiff stated his left leg was numb from his hip to his foot. *Id.* He indicated he could not distinguish between hot and cold with his left foot and leg. *Id.* He claimed he had significant atrophy in his left leg. Tr. at 54. He said his left leg was less than half the size of his right leg. *Id.* He indicated he was unable to hold his knee straight and it tended to collapse if he put pressure on it. *Id.*

Plaintiff testified he could sit for six to 10 minutes prior to having to lean on something. *Id.* He said he would walk five or six times during a typical day in his yard or to a store 50 yards from his home. Tr. at 55. He stated his conditions affected his ability to sit comfortably, as he frequently shifted positions and always felt uncomfortable. *Id.* He said he spent "[t]he better half of the day" sitting down and was in a reclined position for six of nine hours. Tr. at 56. He described his hand grip as a two-and-a-half to three out of five on the left. *Id.* He said he would not trust his left hand to carry a gallon of milk. Tr. at 57.

Plaintiff stated his pain interfered with his ability to concentrate because he constantly thought of it and ways to alleviate it. *Id.* He said he felt irritated and agitated. Tr. at 58.

Plaintiff testified he sustained an approximately 30-foot fall from a tree as a teenager. *Id.* He described a separate incident in which he had struck a tree while riding in the back of a truck. Tr. at 59.

####    b.    Vocational Expert Testimony

Vocational Expert ("VE") William Stewart reviewed the record and testified at the hearing. Tr. at 59–69. The VE categorized Plaintiff's PRW as a firefighter, *Dictionary of Occupational Titles* ("*DOT*") No. 373.364-010, requiring very heavy exertion and a specific vocational preparation ("SVP") of 6; a construction worker, I, *DOT* No. 869.664-014, requiring heavy exertion and an SVP of 4; a salvage laborer, *DOT* No. 929.687-022, requiring medium exertion and an SVP of 2; a painter, *DOT* No. 840.381-010, requiring medium exertion and an SVP of 7; a frame spinner, *DOT* No. 682.685-010, requiring medium exertion and an SVP of 3; and a tank farm attendant, *DOT* No. 559.665-038, requiring medium exertion and an SVP of 4. Tr. at 60–62. The ALJ described a hypothetical individual of Plaintiff's vocational profile who could frequently sit, bend, climb ramps and stairs, push and pull, and stand and reach overhead bilaterally; could never crouch or kneel; could lift and carry a maximum of 35 pounds; and could push and pull a maximum of 95 pounds. Tr. at 62–63. The VE testified that the hypothetical individual would be unable to perform Plaintiff's PRW. Tr. at 63. The ALJ asked whether there were any other jobs in the national economy that the hypothetical person

could perform. *Id.* The VE identified light jobs with an SVP of 2 as an inspector and hand packager, *DOT* No. 559.687-074, an assembler, *DOT* No. 706.684-022, and an inspector, *DOT* No. 727.687-062, with 94,000, 181,000, and 120,000 positions in the national economy, respectively. Tr. at 64.

The ALJ next described an individual of Plaintiff's vocational profile who would be limited to light work; could stand and walk for two hours in an eight-hour workday; could occasionally use the left lower extremity for foot controls; could never climb ladders, ropes, or scaffolds; could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, crawl, and reach overhead bilaterally; and would need to avoid even moderate exposure to temperature extremes, vibrations, wetness, and workplace hazards. Tr. at 64–65. She asked if the individual would be able to perform the jobs the VE previously identified. Tr. at 65. The VE stated he could, but the numbers would be reduced by approximately 60%. *Id.*

The ALJ asked the VE if the jobs would still be available if the individual were required to use a cane for balance and ambulation. *Id.* The VE stated the jobs would not be available. *Id.*

The ALJ asked the VE if he could identify jobs at the sedentary level that would accommodate the restrictions. Tr. at 66. The VE testified the individual could perform sedentary jobs with an SVP of 2 as an order clerk, *DOT* No. 209.567-014, a table worker, *DOT* No. 739.687-182, and an

inspector, *DOT* No. 726.684-050, with 110,000, 90,000, and 64,000 positions in the national economy, respectively. Tr. at 66–67.

The ALJ asked the VE to consider that the individual would have to recline with his legs above heart-level for one-third of the workday. Tr. at 67. She asked if that restriction would be inconsistent with competitive employment. *Id.* The VE confirmed that it would rule out all jobs if it were required on a continuing basis. *Id.*

The ALJ asked the VE if his testimony had been consistent with the information in the *DOT*. *Id.* The VE stated it was reasonably consistent, except that the *DOT* did not cover information about reclining, elevation of the legs, reaching overhead and bilaterally, use of a cane, use of just one lower extremity, and standing and walking only two hours in light work. Tr. at 67–68. He explained that his testimony as to those factors was based on his clinical experience. Tr. at 68.

Plaintiff's counsel asked the VE to offer an opinion as to how much time off-task would be permitted in sedentary, unskilled work. *Id.* The VE testified an individual would be unable to exceed 15% of time off-task during the workday. Tr. at 69.

     2.    The ALJ's Findings

In her decision dated May 19, 2021, the ALJ made the following findings of fact and conclusions of law:

1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2023.

2.  The claimant has not engaged in substantial gainful activity since April 28, 2019, the alleged onset date (20 CFR 404.1571 *et seq.*).

3.  The claimant has the following severe impairments: degenerative disc disease of the cervical spine with radiculopathy, lumbar radiculopathy with frequent falls, and left hip iliopsoas (20 CFR 404.1520(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except further limited by: the use of a cane for ambulation and balance; standing and walking for 2 hours; occasional use lower left extremity for foot controls; no climbing of ladders, ropes or scaffolds; occasionally climbing ramps and stairs, balancing, stooping and crawling, but never kneeling or crouching; occasional reaching overhead with the bilateral upper extremities; and must avoid even moderate exposure to temp extremes, vibrations, wetness and work place hazards.

6.  The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.  The claimant was born on June 4, 1979 and was 39 years old, which is defined as a younger individual age 18–44, on the alleged disability onset date (20 CFR 404.1563).

8.  The claimant has at least a high school education (20 CFR 404.1564).

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferrable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, and 404.1569(a)).

> 11.   The claimant has not been under a disability, as defined in the Social Security Act, from April 28, 2019, through the date of this decision (20 CFR 404.1520(g)).

Tr. at 23–29.

## II.   Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)   the RFC assessment failed to account for the cognitive effects of Plaintiff's chronic pain; and

2)   the ALJ did not consider his hearing testimony in accordance with 20 C.F.R. § 404.1529 and § 416.929 and SSR 16-3p.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in her decision.

### A.   Legal Framework

#### 1.   The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity; (2) whether he has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[2] (4) whether such impairment prevents claimant from performing PRW;[3] and (5) whether the impairment prevents him from doing substantial gainful employment. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a

---

[2] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or are "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[3] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if he can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that he is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th

Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146. n.5 (1987) (regarding burdens of proof).

2.     The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*, *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002) (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound

foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.    Analysis

Although Plaintiff raises two allegations of error, the issues are related such that it is most efficient for the court to consider them together. Plaintiff argues the ALJ failed to properly consider his hearing testimony and address the cognitive effects of his pain in the RFC assessment. [ECF No. 15 at 10–20]. He maintains the ALJ failed to include a provision for time off-task, despite her acknowledgment that pain in his neck and back and numbness in his left hip and leg reasonably caused significant physical limitations and his testimony that his pain caused severe discomfort and impaired concentration. *Id.* at 13–15. He argues the ALJ failed to comply with provisions in 20 C.F.R. § 404.1529 and § 416.929 and SSR 16-3p insomuch as she did not consider relevant, non-medical evidence and did not explain which of his statements were not entirely consistent with the record. *Id.* at 17–20. He asserts the evidence does not support the ALJ's conclusion that he stopped receiving medical treatment because his pain was managed. *Id.* at 20. He contends the

ALJ did not assess his ability to perform all relevant functions in accordance with SSR 96-8p and this court's and the Fourth Circuit's precedent. *Id.* at 15–17.

The Commissioner argues the ALJ explicitly considered Plaintiff's complaints and explained why she found them not entirely consistent with the medical and other evidence. [ECF No. 16 at 9–14]. She maintains the ALJ did not find that Plaintiff's impairments could reasonably cause "debilitating pain," and Plaintiff did not allege mental or emotional problems interfered with his ability to work. *Id.* at 9–10. She maintains the ALJ appropriately considered the gap in the medical evidence as supporting a finding that Plaintiff's symptoms were not as severe as he alleged. *Id.* at 10–11. She contends the ALJ also considered evidence of no significant deficits in functioning during most exams. *Id.* at 11–13. She asserts the ALJ credited Plaintiff's allegations of pain to the extent that she accommodated his alleged need for a cane and reduced left lower extremity strength by limiting him to sedentary work. *Id.* at 13. She claims the ALJ discussed the medical evidence and connected it to the functional limitations she included in the RFC assessment. *Id.* at 14.

The claimant's RFC represents the most he can still do, despite limitations imposed by his impairments and symptoms. 20 C.F.R. §

404.1545(a). The RFC assessment must be based on all the relevant evidence in the case record. SSR 96-8p, 1996 WL 374184, at *2.

"Pain or other symptoms may cause a limitation of function beyond that which can be determined on the basis of the anatomical, physiological or psychological abnormalities considered alone." 20 C.F.R. § 404.1545. "Under the regulations implementing the Social Security Act, an ALJ follows a two-step analysis when considering a claimant's subjective statements about impairments and symptoms." *Lewis v. Berryhill*, 858 F.3d 858, 865–66 (4th Cir. 2017) (citing 20 C.F.R. § 404.1529(b), (c)). "First, the ALJ looks for objective medical evidence showing a condition that could reasonably produce the alleged symptoms." *Id.* at 866 (citing 20 C.F.R. § 404.1529(b)). If the ALJ concludes the impairment could reasonably produce the symptoms the claimant alleges, she is to proceed to the second step, which requires her to "evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's ability to perform basic work activities." *Id.* (citing 20 C.F.R. § 404.1529(c).

The ALJ is not permitted to "evaluate an individual's symptoms based solely on objective medical evidence unless that objective medical evidence supports a finding that the individual is disabled." SSR 16-3p, 2016 WL 1119029. The claimant is "entitled to rely exclusively on subjective evidence to prove" his symptoms are "so continuous and/or so severe that [they]

prevent [him] from working a full eight hour day" if the evidence supports a finding that his medically-determinable impairments could reasonably be expected to cause the symptoms he alleges. *Hines v. Barnhart*, 453 F.3d 559, 565 (4th Cir. 2006). An ALJ "improperly increase[s]" the claimant's "burden of proof" if she requires subjective descriptions of symptoms to be verified by objective medical evidence. *Lewis*, 858 F.3d at 866.

The second determination requires the ALJ to consider "whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between [the claimant's] statements and the rest of the evidence, including [the claimant's] history, the signs and laboratory findings, and statements by [the claimant's] medical sources or other persons about how [his] symptoms affect [him]." 20 C.F.R. § 404.1529(c)(4) Other evidence relevant to evaluation of the consistency between the claimant's statements and the record includes: (1) the claimant's ADLs; (2) the location, duration, frequency, and intensity of the claimant's pain or other symptoms; (3) any factors that precipitate or aggravate the claimant's pain or other symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the claimant receives or has received for relief of pain or other symptoms; (6) any measures the claimant uses or has used to relieve pain or other symptoms (e.g., lying flat on his back, standing

for 15 to 20 minutes every hour, sleeping on a board, etc.); and (7) any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529(c)(3). The more consistent the claimant's statements about the intensity, persistence, and limiting effects of his symptoms are with the objective medical evidence and other evidence of record, the more likely the ALJ will find those symptoms reduce his capacity to perform work-related functions. SSR 16-3p, 2017 WL 5180304, at *10.

The ALJ must include a narrative discussion explaining the restrictions included in the RFC assessment and referencing specific medical facts, such as medical signs and laboratory evidence, and non-medical evidence, including ADLs and observations. SSR 96-8p, 1996 WL 374184, at *7. "The RFC assessment must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence," and the ALJ "must explain how any material inconsistencies or ambiguities in the case record were considered and resolved." *Id.*

If a claimant alleges pain or other impairment-related symptoms, the RFC assessment must:

[1.] [c]ontain a thorough discussion and analysis of the objective medical and other evidence, including the individual's complaints of pain or other symptoms and the adjudicator's personal observations, if appropriate;

31

[2.] [i]nclude a resolution of any inconsistencies in the evidence as a whole; and

[3.] [s]et forth a logical explanation of the effects of the symptoms, including pain, on the individual's ability to work.

*Id.*

"[R]emand may be appropriate where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015).

The ALJ specified the RFC assessment was based on the state agency medical consultants' opinions, the treating provider's opinion, Plaintiff's testimony that he continued to require a cane, and objective findings of reduced strength in the left lower extremity. Tr. at 26. She stated that in assessing Plaintiff's RFC, she had considered all symptoms and the extent to which the symptoms could reasonably be accepted as consistent with the objective medical and other evidence in accordance with 20 C.F.R. § 404.1529 and SSR 16-3p. Tr. at 24.

The ALJ found Plaintiff's medically-determinable impairments could reasonably be expected to cause some of his alleged symptoms, but that his statements concerning the intensity, persistence, and limiting effects of those

symptoms were "not entirely consistent with the medical evidence and other evidence in the record." Tr. at 25. She subsequently noted "the medical evidence of record d[id] not support his allegations fully." Tr. at 26.

The ALJ's decision reflects her reliance on the medical evidence, the medical opinions of record, and evidence as to Plaintiff's medications and the type of treatment he received in evaluating his allegations as to the intensity, persistence, and limiting effects of his symptoms. She discussed the medical evidence, noting results of the May 2019 cervical MRI, treatment notes from physical therapy showing decreased strength in Plaintiff's left lower extremity over the course of treatment, the FCE results and findings of reduced strength on OT Kuykendall's exam, and November 2019 findings of tenderness and pain with motion of the lumbar spine, 3/5 left hip flexion strength, and 4/5 strength to dorsiflexion of the left ankle tibialis anterior. Tr. at 25–26.

The ALJ's evaluation of Plaintiff's allegations and the RFC assessment reflect allocation of persuasive authority to Dr. Cook's opinion limiting Plaintiff to light work and the state agency consultants' opinions limiting Plaintiff to standing and walking for a total of two hours in an eight-hour day, occasional pushing and pulling with the left lower extremity, occasional postural activities, no climbing of ladders, ropes, or scaffolds, occasional overhead reaching with the left arm, no overhead reaching with the right

arm, and avoidance of even moderate exposure to vibration or hazards. Tr. at 26–27. She stated Dr. Cook's opinion was supported by the objective findings, but was not fully consistent with Plaintiff's lack of treatment. Tr. at 26. She concluded the state agency consultants' opinions were well supported by their explanations and consistent with the medical evidence of record. Tr. at 27. She found the FCE only partially persuasive due to its internal inconsistencies. *Id.*

The ALJ acknowledged Plaintiff's specific allegations of work-related functional limitations. She noted Plaintiff's testimony that he was "in a lot of pain," could not work "because he is always in pain," and "has a hard time getting comfortable or concentrating." Tr. at 25. She cited Plaintiff's statements to his medical providers, noting his indications to his physical therapy providers that he had "difficulty finding a comfortable sleeping position, difficulty walking, loss of function, loss of motion, and pain and weakness." *Id.* She noted his reports of falls to his providers. *Id.*

Although the ALJ pointed out that Dr. Cook failed to mention the need for a cane and recommended use of the hinged brace and that Plaintiff was walking without a cane at his last appointment, she credited Plaintiff's testimony in including use of a cane in the RFC assessment. *See* Tr. at 26. The ALJ impliedly rejected Plaintiff's general allegations that discomfort and impaired concentration due to pain would prevent him from completing a

34

normal workday. However, the court is constrained to find that her analysis falls short of the requirements in SSR 96-8p and SSR 16-3p because she did not explicitly conclude that Plaintiff's pain would not prevent him from completing an eight-hour workday and 40-hour workweek with normal breaks or specify that the reasons she provided for concluding his allegations as to the intensity, persistence, and limiting effects of his symptoms failed to support his allegations that he would be unable to engage in work activity on a regular and continuing basis. *See* SSR 96-8p, 1996 WL 374184, at *7 (stating that "[i]n assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e. 8 hours a day, for 5 days a week, or an equivalent work schedule)"); 16-3p, 2017 WL 5180304, at *8 (providing the ALJ must explain which of the claimant's symptoms she found "consistent or inconsistent with the evidence in [the] record and how [her] evaluation of the individual's symptoms led to [her] conclusions").

The ALJ addressed the medication Plaintiff used to alleviate his pain, noting a regimen that included "cyclobenzaprine for sleep, gabapentin, and Aleve or ibuprofen. (Exhibit 12E)." Tr. at 25. She stated "[t]he lack of treatment sought after" November 2019 "suggests that the claimant's pain is managed with his current regimen." Tr. at 26.

Pursuant to SSR 16-3p:

We will consider an individual's attempts to seek medical treatment for symptoms and to follow treatment once it is prescribed when evaluating whether symptom intensity and persistence affect the ability to perform work-related activities . . . . Persistent attempts to obtain relief of symptoms, such as increasing dosages and changing medications, trying a variety of treatments, referrals to specialists, or changing treatment sources may be an indication that an individual's symptoms are a source of distress and may show that they are intense and persistent.

In contrast, if the frequency or extent of the treatment sought by an individual is not comparable with the degree of the individual's subjective complaints, or if the individual fails to follow prescribed treatment that might improve symptoms, we may find the alleged intensity and persistence of an individual's symptoms are inconsistent with the overall evidence of record.

2017 WL 5180304, at *9.

The evidence arguably supports the ALJ's conclusion that Plaintiff's "pain [was] managed with his current regimen." Tr. at 26. The frequency and extent of Plaintiff's treatment was "not comparable with the degree of [his] subjective complaints," as Plaintiff did not seek increasing dosages of medications, try a variety of treatments, seek referrals to specialists, or visit any medical provider between November 20, 2019, and May 4, 2021. *See* SSR 16-3p. However, the ALJ's decision does not reflect her consideration of "possible reasons [Plaintiff] . . . [did] not comply with treatment or seek treatment consistent with the degree of his . . . complaints," as required pursuant to SSR 16-3p.

The record contains evidence that Plaintiff was unable to afford treatment—a specific allegation ALJs must consider in evaluating a claimant's treatment history. *See* SSR 16-3p, 2017 WL 5180304, at *9–10. Plaintiff's representative alleged in his opening statement that "the medical records unfortunately stop at 2019," because "[h]e hasn't had any insurance since that time." Tr. at 41. Plaintiff also testified he had not sought medical treatment when he fell and broke his finger because "I don't have insurance or anything, I couldn't afford the extra bill." Tr. at 50. A "claimant may not be penalized for failing to seek treatment she cannot afford; 'it flies in the face of the patent purposes of the Social Security Act to deny benefits to someone because he is too poor to obtain medical treatment that may help him.'" *Lovejoy v. Heckler*, 790 F.2d 1114, 117 (4th Cir. 1985) (quoting *Gordon v. Schweiker*, 725 F.2d 231, 237 (4th Cir. 1984)).

In *Lovejoy*, court wrote:

> We recognize that the Secretary did not deny benefits on the basis of noncompliance with prescribed treatment; however, it is erroneous to consider the claimant's failure to seek treatment as a factor in the determination that her impairment is not as severe as it would be to reach the ultimate conclusion that the claimant is not disabled because she failed to follow prescribed treatment when that failure is justified by lack of funds.

*Id.* at 1117 (citing *Preston v. Heckler*, 769 F.2d 988 (4th Cir. 1995)). Here, as in *Lovejoy*, the ALJ did not rely exclusive on Plaintiff's failure to obtain additional medical treatment in concluding he was not disabled. She also

cited the medical evidence and the medical opinions of record. Nevertheless, the court is constrained to find she erred in considering it as one factor in her determination without adequately inquiring into and addressing the reasons for Plaintiff's failure to pursue additional treatment. The hearing transcript reflects no inquiry by the ALJ as to what, if any efforts, Plaintiff undertook to obtain free or low-cost medical treatment. The ALJ was not required to excuse Plaintiff's failure to obtain treatment over the approximately 18-month period based solely on an allegation that he could not afford treatment, but she was required to adequately address the allegation prior to concluding his "lack of treatment" was inconsistent with his statements as to the effects of his pain.

In *Patterson v. Commissioner of Social Security Administration*, 846 F.3d 656, 663 (4th Cir. 2017), the court noted the "all too common" problem in administrative decisions challenged in the court of ALJs' failures to show their work. That same problem plagues this case. The ALJ neglected to provide as thorough an explanation as required to support her conclusions as to the intensity, persistence, and limiting effects of Plaintiff's pain on his RFC assessment. Therefore, substantial evidence does not support her decision.

III.    Conclusion

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine that the Commissioner's decision is supported by substantial evidence. Therefore, the undersigned reverses and remands this matter for further administrative proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

IT IS SO ORDERED.

May 2, 2022
Columbia, South Carolina

Shiva V. Hodges
United States Magistrate Judge